FELICE JOHN VITI, Acting United States Attorney (#7007)
BRENT L. ANDRUS, Assistant United States Attorney (NY #5143474)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: brent.andrus@usdoj.gov

FILED US District Court-UT
OCT 01 '25 PM 02:43

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, | **INDICTMENT** |
| Plaintiff, | **Counts 1, 2, 4, 8, 9, 11**:* 18 U.S.C. § 1343 (Wire Fraud) |
| vs. | **Count 3:** 18 U.S.C. § 1344 (Bank Fraud) |
| | **Count 5:** 18 U.S.C. § 1349 (Attempted Wire Fraud) |
| ERIK KEITH BLOMQUIST and JUSTIN D. HEIDEMAN, | **Count 6:** 18 U.S.C. § 1028A (Aggravated Identity Theft) |
| Defendants. | **Count 7:*** 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud) |
| | **Count 10**: 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering) |
| | *Defendant Heideman named in Counts 4, 7 & 8 only. Blomquist named in all counts. |

The Grand Jury Charges:

At all times relevant to this Indictment:

Case: 2:25-cr-00361
Assigned To : Shelby, Robert J.
Assign. Date : 9/30/2025

## General Allegations

1.      Defendant Erik Keith Blomquist owned and controlled an entity named

Two 2's Ranchland Holding Company LLC, registered in the state of Utah.

2.      Defendant Erik Blomquist owned and controlled an entity named EKB22 Investments, LLC, registered in the state of Utah.

3.      At all relevant times below, Inland Boat Club was a Utah County-based enterprise operated by defendant Erik Blomquist and others through various entities registered in the state of Utah.  Inland Boat Club offered access to recreational boats for a membership fee.

### Overview of Schemes to Defraud

4.      Beginning by at least May 2019, within the District of Utah and elsewhere, **Erik Blomquist**, together (at least in respect to some of the schemes) with **Justin Heideman**, defendants herein, devised and intended to devise several schemes and artifices to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and omissions of material facts.

5.      These schemes, alleged more fully below, include the following:

- Defrauding seasonal lenders in the Inland Boat Club by obtaining their loan proceeds through misrepresentations regarding the collateral for loans and the use of the loan proceeds.

- Defrauding Rock Canyon bank by obtaining loan proceeds through misrepresentations in an SBA 7a loan application and documentation necessary to release loan funds.

- Convincing Person-1 to loan money for the purchase of a ranch near Fillmore, Utah through fraudulent promises and misrepresentations.

- Attempting to defraud Person-2 by spoofing Person-2's name and email address in attempt to release funds to Blomquist's control.

- Defrauding Person-3 of loan proceeds used to purchase house in Draper, Utah though various misrepresentations by Blomquist and Heideman.

- Inducing Person-4 into lending money to buy two houseboats through various misrepresentations, when the money was never used to buy houseboats.

- Securing title to Dodge Ram 3500 from Larry H. Miller car dealership through multiple material misrepresentations.

- Defrauding Person-5 of $250,000 in due diligence fees by falsely promising to invest money in Person-5's business.

## COUNTS 1 & 2
18 U.S.C. § 1343
(Wire Fraud)
*Seasonal Boat Club Lenders Scheme*

### The Scheme and Artifice to Defraud

6.    Paragraphs 1 through 5 are repeated and realleged as though fully set forth herein.

7.    From at least May 2019 to present, defendant

### Erik Blomquist

devised and intended to devise a scheme to defraud lenders, including Seasonal Lender 1 and Seasonal Lender 2, to obtain property by means of materially false and fraudulent pretenses, representations and promises.

3

**Manner and Means**

8.    The manner and means by which defendant sought to accomplish the objects and purpose of the scheme and artifice to defraud included, among other things, the following:

9.    Defendant Blomquist and others owned and operated a sport boat rental company called Inland Boat Club from at least 2019 to May 2022. The boat club offered memberships that entitled members access to newer boats in Utah and surrounding states.

10.    Blomquist borrowed money to buy boats to operate Inland Boat Club from multiple individuals, some of whom were referred to as "seasonal loan investors."

11.    Seasonal Lender 1 and Seasonal Lender 2 initially met Blomquist through their memberships in Inland Boat Club.

Victim:  Seasonal Lender 1

12.    Blomquist agreed to pledge 26 specific boats and 2 wave runners to Seasonal Lender 1 as collateral for Seasonal Lender 1 loan of $1,285,000 for Loan 1 (for boat purchases) and a loan of $682,500 for Loan 2 (as an operational expense bridge loan). Seasonal Lender 1 provided the funds to Blomquist over the course of 2020 and early 2021. Both Loan 1 and Loan 2 were reaffirmed in January 2021 in amended loan documents.

13.    Blomquist told Seasonal Lender 1 that he would not allow the boats to be further encumbered by any other security interests. Blomquist agreed not to sell the collateral boats without permission of Seasonal Lender 1. Blomquist promised to perfect

(meaning to file on record) and maintain Seasonal Lender 1's security interest in the boats.

14.    Blomquist did not perfect or maintain Seasonal Lender 1's security interest in the promised collateral. Blomquist later pledged the same Seasonal Lender 1 collateral boats as collateral to other lenders.

15.    Rather than purchase boats and pay operational expenses as promised, Blomquist used the majority of Seasonal Lender 1's loan proceeds to re-pay previous lenders. Blomquist also used the money to pay himself.

<u>Victim: Seasonal Lender 2</u>

16.    Blomquist also induced Seasonal Lender 2 to lend $1,000,000 in short-term financing for the purchase of boats. The loan term was one month, with an option to extend for one more month, for a total possible loan period of 60 days.

17.    Blomquist promised to use the loan proceeds to buy boats. He pledged six specific boats to Seasonal Lender 2 as collateral securing the $1,000,000 loan.

18.    Blomquist represented to Seasonal Lender 2 that the boats serving as collateral were unencumbered and free and clear of all liens, restrictions, and limitations. Blomquist promised that he would perfect Seasonal Lender 2's security interest in the boats by making a UCC-1 filing with the State of Utah. Blomquist promised Seasonal Lender 2 that Seasonal Lender 2 had a perfected first-priority security interest in the boats in question. Blomquist promised that he would not allow any other lien or security interest to encumber the boats pledged as collateral for Seasonal Lender 2's loan.

19.    These representations and promises were false. The six boats pledged as collateral to Seasonal Lender 2 had, in fact, already been pledged as collateral to Seasonal Lender 1. Blomquist did not perfect Seasonal Lender 2's security interest by filing a UCC-1 filing with the State of Utah. Blomquist also further encumbered these 6 boats by pledging them as collateral to future lenders.

20.    Blomquist used the majority of the Seasonal Lender 2 loan proceeds to repay previous lenders, pay operational expenses, and pay himself.

21.    Blomquist promised to repay Seasonal Lender 1 and Seasonal Lender 2 when he obtained a $3.9 million SBA loan through Rock Canyon bank in spring 2021. He obtained an SBA loan but did not use the proceeds to repay Seasonal Lender 1 or Seasonal Lender 2.

22.    Blomquist made many subsequent misrepresentations regarding repayment to Seasonal Lender 1 and Seasonal Lender 2. They were not repaid.

### Wire in Furtherance of the Scheme

23.    On or about each of the dates set forth below, in the District of Utah and elsewhere,

### Erik Blomquist

defendant herein, for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below, each wire constituting a separate count, and did aid and abet others in so doing, all in violation of 18 U.S.C. Section 1343:

6

| | Amount | Date | Wire Details | Purpose |
|---|---|---|---|---|
| **Count 1** | $750,000 | Oct. 2, 2020 | Fedwire from Seasonal Lender 1 account at Central Bank to Inland Boat Club account (X2239) at Utah First Credit Union | Portion of Seasonal Lender 1's Loan 1 proceeds |
| **Count 2** | $1,000,000 | Feb. 3, 2021 | Fedwire from Seasonal Lender 2 account at Rock Canyon Bank to Inland Boat Club account (X0144) at Glacier Bank | Seasonal Lender 2 short-term loan |

## COUNT 3
### 18 U.S.C. § 1344
### (Bank Fraud)
*Rock Canyon Bank SBA Loan*

24.     Paragraphs 1 through 23 are repeated and realleged as though fully set forth herein.

25.     In or around the spring of 2021, **Erik Blomquist**, on behalf of Inland Boat Club, sought an SBA 7a loan from Rock Canyon Bank, a Small Business Administration preferred lender.  Blomquist stated that the proceeds would be used to refinance existing debt, purchase new boats, and provide working capital.

26.     In the submitted application, Blomquist answered "no" to the question asking whether he had ever been convicted of a criminal offense.  In fact, at the time of this application, as Blomquist well knew, he had been convicted of (1) Securities Fraud in 2015 and (2) Theft by Deception and Forgery 2012, both in Utah Fourth District Court.

27.     Blomquist pledged 25 boats and 2 wave runners as collateral for the SBA loan. Blomquist claimed that the boats serving as collateral for the SBA loan were free and clear of all liens and encumbrances other than the lien from the SBA loan. Blomquist knew was not true. Boats that were pledged as collateral to Rock Canyon Bank for the SBA loan had already been pledged to other lenders, including Seasonal Lender 1 and Seasonal Lender 2.

28.     Relying on Blomquist's misrepresentations, Rock Canyon Bank approved a loan of $3.924 million for Inland Boat Club in May 2021 under the name Inland Boat Club Holdings II. Blomquist submitted and signed the loan documents as manager of the boat club.

29.     Of the SBA loan fund proceeds, $1.2 million were designated to buy new boats. The bank required documentation supporting the purchase of a particular boat before it would release funds for the purchase. Blomquist provided fraudulent boat purchase documents to Rock Canyon Bank to gain access to these funds. For example, he submitted fraudulent purchase agreements, fake bills of sale, and phony boat Hull Identification Numbers.

30.     Instead of purchasing new boats with these funds, Blomquist used the funds to repay old lenders and to pay himself.

31.     Beginning on or about April 22, 2021 and continuing through at least September 2021, in the District of Utah and elsewhere,

**Erik Blomquist**

8

defendant herein, did knowingly execute and attempt to execute a scheme and artifice to

obtain money, funds, credits, assets, or other property owned by, or under the custody

and control of a financial institution, to wit Rock Canyon Bank, by means of false and

fraudulent pretenses, representations, and promises, namely, misrepresentations in the

loan application and in materials submitted to gain access to loan funds.

### COUNT 4
18 U.S.C. § 1343
(Wire Fraud)
*Scheme Involving Repurchase of Boat Club from Person-1*

32.     Paragraphs 1 through 31 are repeated and realleged as though fully set forth

herein.

### The Scheme and Artifice to Defraud

33.     From at least January 2022 to present, in the District of Utah and

elsewhere,

**Erik Blomquist** and
**Justin Heideman**

defendants herein, devised and intended to devise a scheme to defraud Person-1, and to

obtain money and property by means of materially false and fraudulent pretenses,

representations and promises.

### Manner and Means

34.     Person-1 became acquainted with Erik Blomquist through mutual

connections in the Utah County boating community.

35.  Blomquist informed Person-1 in 2022 that Inland Boat Company was going through bankruptcy and their boats had been repossessed by a lender. Person-1 agreed to buy the note from Rock Canyon Bank for $3.65 million in June 2022.

36.  Blomquist promised Person-1 from the outset that Blomquist would buy the boat club back from Person-1 at a future date.

37.  Inland Boat Club still went through the bankruptcy process and was purchased by Person-1 out of bankruptcy for an additional $805,000. Blomquist continued to be involved with the boat club after the bankruptcy.

38.  Following the bankruptcy, Blomquist continued to assure Person-1 that Blomquist would buy the boat club. Blomquist entered into multiple written agreements to buy Inland Boat Club from Person-1 for roughly $7-10 million.

39.  In spring 2024, while Blomquist was claiming to have the ability and intention to buy the boat club, Blomquist told Person-1 that he was also raising money to buy a large ranch near Fillmore, Utah. Blomquist told Person-1 that the ranch purchase and the boat club purchase were contingent upon each other.

40.  Blomquist told Person-1 that he had raised $20,000,000 for the ranch purchase, but that he was still $468,000 short. Blomquist told Person-1 that if Person-1 invested in the ranch purchase and provided the remaining necessary funds, Blomquist would finally close on the purchase of the boat club.

41.  Person-1 agreed to invest $500,000 in the ranch. Person-1 provided a cashier's check to Justin Heideman's law firm which cleared on March 27, 2024. Person-

1 believed this payment method would provide an additional layer of security for his investment.

42.    Blomquist claimed to Person-1 on multiple occasions to have sent wire payment for the purchase of the boat club. Blomquist provided phony wire numbers to Person-1 to assure him the wire payment had been sent and that his purchase of the boat club was therefore complete.

43.    In November 2024, Blomquist claimed to have sent a wire to Person-1 for the $7,936,000 purchase amount and included a screenshot of a wire confirmation to what appeared to be Person-1's bank account number. The money never arrived. Person-1 went to a Chase Bank location in Orem, UT to ask about the wire. A branch manager helped Person-1 discover that Blomquist had sent a $10 wire to a third-party account with the same last four account number digits as Person-1's account in order to be able to show Person-1 the partial wire confirmation screen shot. It appeared that Blomquist used this screen shot from the $10 wire to claim he had already sent a wire of $7,936,000 to Person-1 for the purchase of the boat club.

44.    Blomquist delivered multiple fraudulent checks to Person-1 for the purchase of the boat club. Along with one cashier's check in the amount of $7,936,000, Blomquist delivered a letter dated January 8, 2025 purporting to be from Chase Bank. The letter stated that Blomquist's company, Pando Ridge Ventures, maintained active Chase accounts, including accounts ending in 3986, 2070, and 0185. The letter claimed that the company had over $20,000,000 in its accounts as of January 8, 2025.

45.     In reality, the three listed accounts in this letter had a total balance on January 8, 2025 of $2.43.  In nine JPMorgan Chase accounts associated with Blomquist there was a negative total balance as of January 8, 2025.

46.     The $7,936,000 cashier's check delivered to Person-1 was returned as counterfeit.

47.     On April 14 and June 26, 2025, Person-1 demanded his $500,000 back from Heideman.  Heideman did not return it.  Heideman responded that he was confident the ranch purchase would still go through.  Heideman offered to show proof of funds and claimed that ranch partnership K-1s would be forthcoming.

48.     Blomquist never provided any funds to Person-1 for the boat club purchase.  The $500,000 that Person-1 invested in the Fillmore ranch was never returned.  The ranch was never purchased.

### Wire in Furtherance of the Scheme

49.     On or about the date set forth below, in the District of Utah and elsewhere,

**Erik Blomquist** and
**Justin Heideman**

defendants herein, for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below, and did aid and abet others in so doing, all in violation of 18 U.S.C. Section 1343:

|  | Amount | Date | Details | Purpose |
|---|---|---|---|---|
| **Count 4** | $500,000 | March 27, 2024 | Cashier's check remitted by Person-1 issued by Zion's Bank deposited into Justin Heideman's law firm IOLTA account at Hillcrest Bank (XXX6961) | Person-1 investment in ranch with promise of boat club purchase |

## COUNT 5
18 U.S.C. §§ 1343 and 1349
(Attempted Wire Fraud)
*Scheme Involving Ranch purchase - Proof of Funds Loan*

50.     Paragraphs 1 through 49 are repeated and realleged as though fully set forth herein.

### The Scheme and Artifice to Defraud

51.     From no later than March 15, 2024 to at least July 5, 2024, in the District of Utah and elsewhere,

### Erik Blomquist

defendant herein, devised and intended to devise a scheme to defraud private lender, Person-2, to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and attempted to do so. The fraud involved convincing Person-2 to lend $2.5 million to Blomquist to supposedly serve as proof of funds for purchase of a ranch near Fillmore, Utah. Once the funds were delivered to Heideman's law firm trust account by Person-2, Blomquist attempted to fraudulently

13

induce the release of the funds to himself by impersonating Person-2 through a spoofed email account.

### Manner and Means

52.    Erik Blomquist was the manager of Two 2's Ranchland Holding Company LLC. Blomquist approached Person-2 about lending $2.5 million on short term basis to serve as "proof of funds" in order to secure the purchase of a large piece of land near Fillmore, Utah.

53.    Person-2 agreed to loan $2.5 million to Blomquist via his LLC for four weeks at 7% interest.

54.    As part of the loan, the parties agreed that the loan proceeds would remain on deposit with Blomquist's attorney, Justin Heideman, never to be moved from the attorney IOLTA account until it was repaid to Person-2. An IOLTA account is a type of trust account used by lawyer to hold funds that belong to clients or other third parties.

55.    Heideman separately assured Person-2 via letter that "no transfer of these funds will take place without express written authorization, which authorization must then be confirmed verbally by telephone."

56.    The funds were wired from Person-2's LLC to Heideman on March 15, 2024.

57.    On March 22, 2024, Heideman sent a message to Person-2 along with a screenshot of an email purporting to have been written by Person-2 to Blomquist stating that Person-2 "ultimately [doesn't] care what happens with the funds. . . as long as they are paid back as agreed."

58.    Heideman stated that he had received the screenshot of the purported email from Person-2 to Blomquist and would therefore be "releasing funds today for [Blomquist]'s purposes." Heideman sought confirmation from Person-2 that this was in accordance with Person-2's instructions.

59.    Person-2 stated that he never sent the email in question, that he had never authorized the release of funds, and the loan funds were not to be moved under any circumstances.

60.    Further investigation revealed that the purported email from Person-2 authorizing the release of funds was sent from a Gmail email account, whose address was a slight derivative of Person-2's full name. The name assigned to the spoofed email account was Person-2's actual name.

61.    On or about March 21, 2024, Blomquist created the spoofed Person-2 email account. From the spoofed account, Blomquist sent the unauthorized fund release email. He then sent a screenshot of the spoofed email to Heideman as part of a scheme to obtain the funds from Heideman's IOLTA account.

### Wire in Furtherance of the Scheme

62.    On or about the date set forth below, in the District of Utah and elsewhere,

### Erik Blomquist

defendants herein, for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below, and did aid and abet others in so doing, all in violation of 18 U.S.C. Sections 1343 and 1349:

|          | Amount      | Date              | Details                                                                                   | Purpose                                                    |
|----------|-------------|-------------------|-------------------------------------------------------------------------------------------|-----------------------------------------------------------|
| Count 5  | $2,412,500  | March 15, 2024    | Transfer of funds from Person-2's limited liability company to Heideman's account ending in X7282 | Person-2's loan to Blomquist to purchase ranch |

## COUNT 6
18 U.S.C. § 1028A
(Aggravated Identity Theft)
*Proof of Funds – Email Spoofing*

63.     On or around March 21, 2024, in the District of Utah and elsewhere,

**Erik Blomquist**,

defendant herein, during and in relation to a felony violation, to wit, Wire Fraud in

violation of 18 U.S.C. § 1343, knowingly attempted to and did, without lawful authority,

transfer, possess and use a means of identification of another person, that is, personal

identifying information, including the name, for Person-2, an individual whose full identity

is known to the Grand Jury.

## COUNT 7
18 U.S.C. § 1349
(Conspiracy to Commit Wire Fraud)
*Scheme Involving the Draper House Purchase*

64.     Paragraphs 1 through 63 are repeated and realleged as though fully set forth

herein.

### The Conspiracy to Defraud

65.     From at least March 2024 until the present, in the District of Utah and

elsewhere,

**Erik Blomquist** and

16

**Justin Heideman,**

defendants herein, knowingly and willfully conspired and agreed with each other and

with other persons both known and unknown to the Grand Jury to commit wire fraud in

violation of 18 U.S.C. § 1343, all in violation of 18 U.S.C. § 1349.

66.     It was the object of the conspiracy that the defendants would by deceit,

craft, trickery and dishonest means, defraud private investor Person-3 through a scheme

to obtain a $2.1 million loan for the purported purchase, subdivision, and sale of a

residential property in Draper, Utah, utilizing and causing interstate wires as part of the

scheme, and to cover up and conceal that scheme.

### Manner and Means

67.     Person-3 is a neighbor to Heideman.  He had loaned money to Heideman's

law firm and clients on several occasions in the past.

68.     In March 2024, Heideman approached Person-3 about lending money to

Blomquist.  Heideman stated that Blomquist needed $2.1 million to buy a residential

property located in Draper, Utah.  The parcel had one house on it already.  Heideman

stated that Blomquist would subdivide the property into two lots and then sell both lots

for a profit.  Heideman claimed that Blomquist already had buyers for the two parcels of

land.  The loan would have a 10-day term and would pay $135,000 in interest.

69.     Person-3 agreed and transferred $2.1 million by interstate wire to

Heideman in March 2024.  On March 28, 2024, Heideman sent $2.05 million to Real

Advantage Title Agency for the purchase of a residential property located at 782 E. Ivy

Manor Ln, Draper, Utah 84020. After purchase, the property was owned by EKB22 Investments, LLC, Blomquist's wholly owned company.

70.    In late March 2024, Heideman told Person-3 that one part of the property was closing that day and that he could expect a return of $600,000 the next day. Heideman wrote a check for $600,000 to Person-3 that was posted on April 2, 2024. This repaid a portion of the $2.1 million loan. Heideman claimed that the second portion of the property sale was scheduled to close on April 5, 2024. These representations were false.

71.    Heideman made multiple false and misleading statements to Person-3 regarding the loan, the real estate transaction, and the lack of repayment. Heideman made numerous additional representations about closing the real estate transaction, recording property transaction documents, issues with the title company, and the location and availability of funds.

72.    Blomquist also made many similar false and misleading statements to Person-3. Blomquist claimed that the sale of the second parcel was fully closed by early May 2024. He also made many representations about the money arriving "tomorrow" and technical issues with the payment.

73.    Contrary to the representations made by Blomquist and Heideman to Person-3, the property was never subdivided or sold. The home exists but is in an area zoned for 40,000 square feet lots. Any subdivision of the lot would require a rezoning application, among other things. No rezoning or subdividing applications were submitted to Draper city since Blomquist purchased the home.

18

74.    In reality, Blomquist has been living in the Draper home purchased with Person-3's loan proceeds and holding it out as his personal residence since at least May 2024.

75.    In November 2024, Heideman delivered a check to Person-3 for $2.6 million. The check was for "Payment in full, accrual & satisfaction" and was dated September 24, 2024. Person-3 attempted to deposit the check in November 2024. The check bounced. The balance in Heideman's account from which the check was written in September 2024 varied from (negative) -$907 to $32,222. The balance in November 2024 varied from (negative) -$1,658 to $35,000.

76.    In January 2025, Blomquist and Person-3 came to a resolution of the $1.5 million unpaid balance, accrued interest, and roughly $900,000 still owed by Heideman to Person-3. Blomquist delivered an official cashier's check to Person-3 in the amount of $2.645 million. The cashier's check was fictitious.

77.    All in violation of 18 U.S.C. § 1349.

## COUNT 8
### 18 U.S.C. § 1343
### (Wire Fraud)
*Scheme involving Houseboat Loan – Person-4*

78.    Paragraphs 1 through 77 are repeated and realleged as though fully set forth herein.

### The Scheme and Artifice to Defraud

79.    From at least April 2024 to the present, in the District of Utah and elsewhere,

**Erik Blomquist** and
**Justin Heideman**,

devised and intended to devise a scheme to defraud Person-4, and to obtain money and

property by means of materially false and fraudulent pretenses, representations and

promises.

### Manner and Means

80.    In May 2024, Erik Blomquist sought a roughly $1 million loan from

Person-4 to purchase two houseboats. Blomquist stated he planned to use the loan to

purchase two houseboats that he would sell shares in and rent out to others at Lake

Powell.

81.    Blomquist, Person-4, and Justin Heideman discussed the use of the

proceeds prior to Person-4 lending the money. Heideman and Blomquist represented that

the funds would be used to purchase two houseboats.

82.    On May 29, 2024, Person-4 wired, through his LLC, $640,000 to Heideman

bank account as part of the loan proceeds. The memo on the wire stated "FOR

PURCHASE OF 1997 STARDUST HOUSEBOAT". The balance in the account was

$815.47 before this wire.

83.    The next day, on May 30, 2024, Heideman wired $600,000 from this

account to Prospect Title Insurance for the purchase of a home located at 1375 W 1980 N

in Provo, Utah. The same day, Heideman also sent $40,000 directly to the seller of the

same house.

84.    On June 3, 2024, Person-4 wired, through his LLC, $408,311.44 to Heideman's bank account as part of the loan proceeds.

85.    After receiving the $408,311.44 for the purchase of the second houseboat, Heideman used the funds to make multiple payments to American Express, Barclays, and Goldman Sachs.  Heideman also reimbursed attorney's fees and paid himself

86.    Person-4 later demanded title to the two houseboats that Heideman and Blomquist promised would be purchased.  Title was never provided.  The houseboats were never purchased.

87.    Blomquist provided Person-4 with a check for $1,133,324.68 dated October 28, 2024 for payoff of the loan.  The check bounced.

## Wire in Furtherance of the Scheme

88.    On or about the date set forth below, in the District of Utah and elsewhere,

**Erik Blomquist** and
**Justin Heideman**

defendants herein, for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below, and did aid and abet others in so doing, all in violation of 18 U.S.C. Section 1343:

| | Amount | Date | Details | Purpose |
|---|---|---|---|---|
| **Count 8** | $600,000 | May 30, 2024 | Wire transfer to Prospect Title Insurance from Heideman account at JPMorgan Chase (XX5650) | Use of Person-4 houseboat loan proceeds to purchase house for Justin Heideman |

## COUNT 9
### 18 U.S.C. § 1343
### (Wire Fraud)
*Scheme involving Car Purchase - Larry H. Miller*

89.    Paragraphs 1 through 88 are repeated and realleged as though fully set forth herein.

### **The Scheme and Artifice to Defraud**

90.    From at least May 2024 to present, in the District of Utah and elsewhere,

### **Erik Blomquist**

defendant herein, devised and intended to devise a scheme to defraud Larry H. Miller Chrysler Jeep Dodge Ram, and to obtain property by means of materially false and fraudulent pretenses, representations and promises.

### **Manner and Means**

91.    In May 2024, Blomquist sought to purchase two vehicles from Larry H. Miller Chrysler Jeep Dodge Ram in Sandy, Utah. Blomquist and his wife left the dealership with the two vehicles with a promise to wire roughly $150,000, the full amount due for the two vehicles.

92.    The dealership did not receive payment despite numerous requests and promises to pay by Blomquist. Blomquist used deceptive tactics to put off payment.

93.    During one conversation regarding the lack of payment, Blomquist claimed he was on an airplane and couldn't talk on the phone to a dealership representative. Roughly 5 minutes later, another dealership employee saw Blomquist eating at a restaurant with his wife in Draper, Utah.

94.    Blomquist provided multiple bounced checks for the amount owed for the two vehicles. Blomquist provided a screenshot of his bank account to dealership representatives purporting to show that both checks had cleared Blomquist's bank account. The dealership was later notified that the two checks had bounced.

95.    Roughly four months after taking possession of the vehicles with the promise of payment, Blomquist provided sufficient funds to pay for the remaining amounts owed for the vehicles.

96.    In October 2024, Blomquist attempted to buy a third vehicle from the same dealership. Dealership management informed staff that Blomquist was not to be allowed to take possession of any vehicle until purchase funds had cleared through the dealership's bank.

97.    While dealership management was out of town, Blomquist brought a check to the dealership's finance department for $103,190.74, the full purchase price of the third vehicle, a Dodge Ram 3500 VIN 3C63RRRL7RG225388. Based on this check, employees at the dealership provided the vehicle to Blomquist and signed over title to Blomquist's business name.

98.    The $103,190.74 check bounced for insufficient funds.

99.    On December 13, 2024, Blomquist corresponded via email with representatives of the dealership regarding their demand for immediate return of the third vehicle or payment in full. Blomquist assured the dealership that he and his company had "no intention of not fulfilling [our] financial obligations with your dealership nor is there any intent of unjust enrichment, or any intent to not honor the vehicle purchase agreement and definitely no fraudulent misrepresentation."

100.    Blomquist claimed in the email that the failed payments were the result of bank technicalities or "an overly protective fraud prevention team" at one of the banks. He offered to provide a cashier's check for the full amount within three days.

101.    In January 2025, Blomquist provided a cashier's check purportedly from JPMorgan Chase for the precise amount of the third vehicle purchase, $103,190.74. This cashier's check was fraudulent.

102.    In March 2025, Blomquist engaged in further email communications with dealership representatives, attempting to put off their complaints of non-payment as "just a very big misunderstanding."

103.    On or about April 3, 2025, Blomquist traded in the stolen 2024 Dodge Ram 3500 to National Auto Plaza in exchange for a 2024 Lexus GX VIN JTJTBCDX4R5030583. The Lexus GX had a purchase price of $94,914.41. Blomquist was given an allowance for trade in of $73,000 for the Dodge Ram. Blomquist paid the balance due via cashier's check.

## Wire in Furtherance of the Scheme

104.    On or about the date set forth below, in the District of Utah and elsewhere,

**Erik Blomquist**,

defendant herein, for the purpose of executing the scheme described above, and attempting

to do so, caused to be transmitted by means of wire communication in interstate commerce

the signals and sounds described below, all in violation of 18 U.S.C. Section 1343:

| | To | From | Date | Subject |
|---|---|---|---|---|
| Count 10 9 BA | Numerous email accounts for Larry H. Miller representatives; erik@inlandboat-club.com | Erik Blomquist at "erik@pandoridge-ventures.com" | December 13, 2024 at 8:49 am | "Re: DEMAND FOR IMMEDATE PAYMENT OR RETURN OF THE VEHICLE" |

## COUNT 10
18 U.S.C. § 1956(a)
(Concealment Money Laundering)
*Laundering of Funds in Stolen Car Trade-In Scheme*

105.    Paragraphs 1 through 104 are repeated and realleged as though fully stated

herein.

106.    On or about April 3, 2025, in the District of Utah and elsewhere,

**Erik Blomquist**,

defendant herein, did conduct and attempt to conduct a financial transaction, namely,

$94,914.41 Lexus GX car purchase at National Auto Plaza made possible with $73,000

credit for 2024 Dodge Ram 3500, which transaction in fact involved proceeds of specified

unlawful activity – to wit, wire fraud against Larry H. Miller described above – knowing

that the property involved in the transaction represented proceeds of some form of unlawful

activity and that the transaction was designed in whole or part to conceal or disguise the

nature, location, source, ownership or control of the proceeds of the wire fraud, and did

knowingly and intentionally aid abet others in conduction the transaction, all in violation of

18 U.S.C. §§ 1956(a)(l)(B)(i).

## COUNT 11
18 U.S.C. § 1343
(Wire Fraud)
*Due Diligence Fee Fraud*

### The Scheme and Artifice to Defraud

107.    Paragraphs 1 through 106 are repeated and realleged as though fully stated

herein.

108.    From September 2024 to present, in the District of Utah and elsewhere,

### Erik Blomquist

defendant herein, devised and intended to devise a scheme to defraud Person-5 and his

company, to obtain property by means of materially false and fraudulent pretenses,

representations and promises.

### Manner and Means

109.    Blomquist heard about Person-5's business venture that needed investment.

110.    Blomquist expressed a desire to invest in Person-5's venture.  Blomquist

agreed to make an equity investment of $250,000 and a loan of $2,000,000.  Prior to

making his investment, Blomquist required that Person-5 and his company provide

$250,000 for setup and due diligence costs.

26

111.    Blomquist signed a written letter of intent on September 24, 2024, followed by formal deal documents.  Blomquist claimed to be utilizing the company AED Investments, LLC for the investment.  The signed documents provided for a schedule of investment payments from Blomquist starting October 1, 2024.

112.    Blomquist claimed to already be in possession of the money that he would use to invest in Person-5's business.

113.    On September 27, 2024, Person-5 and his company sent the $250,000 due diligence fee to Blomquist.  But Blomquist never sent any funds for his $250,000 equity investment or $2,000,000 loan.

114.    Blomquist made multiple excuses about why he had not yet sent the money. He claimed to have attempted to deliver a cashier's check to Person-5's bank, but that the bank was closed when he arrived.  He claimed that checks had already been delivered to Person-5's bank and would be deposited the next day.

115.    Blomquist claimed on multiple occasions to have already sent the wire, but that a fraud alert or some other bank technicality had gotten in the way.  He provided a phony federal reference number for the wire he supposedly sent to Person-5.  He claimed that one wire he sent was stopped due to a Department of Homeland Security or PATRIOT Act issue.

116.    On other occasions, Blomquist claimed his lack of payment was due to his house being flooded, health issues with his child, and a family dental emergency.

117.    Blomquist refused to return the $250,000 due diligence payment.  He repeatedly claimed the deal would still get done and he had the funds to pay.

27

118.     Blomquist claimed in November 2024 that he was prepared to make an even larger investment with Person-5 of $22,750,000.   He sent Person-5 a screenshot purporting to show Blomquist's bank account with a $27,000,000 balance.

### Wire in Furtherance of the Scheme

119.     On or about the date set forth below, in the District of Utah and elsewhere,

**Erik Blomquist,**

defendant herein, for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below:

|  | Amount | Date | Details | Purpose |
|---|---|---|---|---|
| **Count 11** | $250,000 | Sept. 27, 2024 | Fedwire sent from Fortis Bank to EKB22 Investments account at JPMorgan Chase (XX2899) | Due Diligence Fee prior to $2 million loan by Blomquist |

### NOTICE OF INTENT TO SEEK FORFEITURE

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of any offense violating 18 U.S.C. §§ 1343, 1344 or 1349, the defendants shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the offense.

Pursuant to 18 U.S.C. § 982(a)(2)(A), upon conviction of any offense violating 18 U.S.C. §§ 1343, 1344 or 1349, the defendants shall forfeit to the United States of America any property constituting, or derived from, proceeds obtained directly or indirectly, as a result of the offense.

Pursuant to 18 U.S.C. § 982(a)(1), upon conviction of any offense in violation of 18 U.S.C. §§ 1956 or 1957, the defendants shall forfeit to the United States of America any property, real or personal, involved in the offense, and any property traceable to such property.

The property sought for forfeiture under one or more of the forfeiture authorities cited above, includes, but is not limited to, the following:

- Residential property located at 782 E. Ivy Manor Ln, Draper, Utah 84020 titled to EKB22 Investments, LLC, a company wholly-owned by Blomquist;

- 2024 Lexus GX SUV, VIN JTJTBCDX4R5030583, with registered owner NBCHC, LLC;

- Residential property located at 1375 W 1980 N in Provo, Utah.

The United States may seek a forfeiture money judgment equal to the value of any property not available for forfeiture as a result of any act or omission of the defendants for one or more of the reasons listed in 21 U.S.C. § 853(p).

[continued on following page]

The United States may also seek to forfeit substitute assets under 21 U.S.C.

§ 853(p).


A TRUE BILL:

FOREPERSON OF GRAND JURY

FELICE JOHN VITI
Acting United States Attorney

BRENT L. ANDRUS
Assistant United States Attorney